Patrick T. Michael (State Bar No. 169745)
pmichael@jonesday.com
Lara Kollios (State Bar No. 235395)
lkollios@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104-1500
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
HYPERCOM CORPORATION

FILED
2011 JUL 29 A 11:56
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CV 11 80 181MISC

| | |
|---|---|
| **CARDSOFT, INC. and CARDSOFT (Assignment for Benefit of Creditors), LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**VERIFONE HOLDINGS, INC., VERFONE INC., HYPERCOM CORP., et al.**<br><br>**Defendants.** | **CASE NO. MISC.: ____________**<br><br>**[Underlying Case No. 2:08-cv-00098-CE in the U.S. District Court, Eastern District of Texas, Marshall Division]**<br><br>**HYPERCOM CORPORATION'S NOTICE OF MOTION AND MOTION TO COMPEL COMPLIANCE WITH FEDERAL RULE OF CIVIL PROCEDURE 45 SUBPOENA FOR DEPOSITION AND PRODUCTION OF DOCUMENTS OF THIRD PARTY DONALD E. SWEET**<br><br>**Declaration of Robert W. Kantner and [Proposed] Order filed concurrently herewith** |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION....1

RELIEF REQUESTED....1

MEMORANDUM OF POINTS AND AUTHORITIES....1

I. INTRODUCTION....1

II. BACKGROUND FACTS....2

A. The Cardsoft Business....2

B. Sweet Becomes CEO of Cardsoft....5

C. Cardsoft's Patent Lawsuit Against Hypercome....9

III. HYPERCOM'S MEET AND CONFER EFFORTS....9

IV. MR. SWEET SHOULD BE ORDERED TO GIVE A DEPOSITION AND TO PRODUCE DOCUMENTS....11

V. CONCLUSION....12

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Cruz v. Meachum*
159 F.R.D. 366 (D. Conn. 1994) ....................12

*Gonzalez v. Google, Inc.*
234 F.R.D. 674 (N.D. Cal. 2006)....................11

*Needa Parts Manufacturing, Inc. v. Psnet, Inc.*
2009 WL 174002 (E.D. Mich. Jan. 23, 2009) ....................11

## Rules

Federal Rule of Civil Procedure 26 ....................1

Federal Rule of Civil Procedure 30 ....................1

Federal Rule of Civil Procedure 34 ....................11

Federal Rule of Civil Procedure 45 ....................1, 11, 12

## NOTICE OF MOTION

PLEASE TAKE NOTICE that at a time to be set by the Court on or after September 1, 2011, before the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, 19th floor, San Francisco, California, defendant Hypercom Corporation will move the Court for an order compelling Donald E. Sweet to comply with a deposition and document subpoena issued out of this Court and served by Hypercom in the underlying action.

This Motion is made pursuant to Federal Rules of Civil Procedure 26, 30 and 45, and the United States District Court Northern District of California Local Rules on the grounds that Mr. Sweet failed to appear for his subpoenaed July 6, 2011 deposition or respond to the corresponding document requests, and Hypercom's good faith efforts to resolve this dispute informally have been unsuccessful.

This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Robert W. Kantner and exhibits attached thereto, and upon such other evidence and argument as properly may be presented before or at the time of the hearing. A proposed order is also submitted herewith.

## RELIEF REQUESTED

Pursuant to Federal Rule of Civil Procedure 45, defendant Hypercom seeks an order compelling Mr. Sweet to attend his deposition and to respond to the corresponding document requests in full compliance with the subpoena served on May 22, 2011 within ten days of the Court's order granting Hypercom's motion to compel.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Cardsoft, Inc. ("Cardsoft") and Cardsoft (Assignment for the Benefit of Creditors), LLC ("Cardsoft Creditors") have sued Hypercom Corporation ("Hypercom") and other companies for infringement of United States Patents Nos. 6,934,945 and 7,302,683 for a "Method and Apparatus for Controlling Communications" (the latter patent being a continuation of the application that became the former patent). The accused products are electronic funds transfer/point of sale

terminals used to process credit card transactions in restaurants and stores. This action (the "Texas Action") is pending in the Marshall Division of the Eastern District of Texas. The cut-off for fact discovery in the Texas Action is October 3, 2011. The case is set for trial on November 7, 2011.[1]

Hypercom subpoenaed for deposition Donald E. Sweet, who was the Chief Executive Officer of Cardsoft during a period of time relevant to the lawsuit. As Sweet resides in Emerald Hills California in this District, the subpoena issued out of this Court. Sweet, who is represented by Cardsoft's and Cardsoft Creditors' trial counsel, has refused to appear for his deposition, claiming he is unable to give a deposition for medical reasons. Accordingly, this Court's intervention is now required and for the reasons stated below, Sweet should be ordered to comply with the subpoena.

## II. <u>BACKGROUND FACTS</u>

### A. The Cardsoft Business

The inventor named on both patents is Ian Ogilvy, a native of Australia. Ironically, from 1988 to 1993, Ogilvy worked for the Australian affiliate of the Ingenico Defendants in the Texas Action. Beginning in 1993, Ogilvy developed a group of products that would later be sold by Cardsoft. In particular, Ogilvy developed a product called CardScript. CardScript is an implementation of the patents.[2] CardScript consisted of two components: (1) a software "Virtual Machine" that could be installed on payment terminals and other payment machines and that would allow the terminals to use any CardScript program; and (2) a software Rapid Acceleration Development ("RAD") tool facilitating the development of programs for the CardScript "Virtual Machine."

Ogilvy's approach was agnostic to, i.e., independent of, the particular hardware and operating system software on a particular terminal. One Cardsoft document[3] describes CardScript as follows:

---

[1] *See* Declaration of Robert W. Kantner ("Kantner Declaration"),¶ 2 in Hypercom Corporation's Appendix in Support of Motion to Compel Deposition ("Hypercom Appendix") at p. 1.

[2] Ogilvy Dep., Vol. I, p. 36 (Hypercom Appendix, at p. 66).

[3] *Id.*, pp. 37-39 (Hypercom Appendix pp. 68-69).

> CardScript is also a script based cross platform language. Removing the technical terms, this means that a program created in CardScript can be used on any payment terminal, and even on devices which may not previously have been considered as possible payment terminals including smart telephones, Electronic Cash Registers, etc.

The '945 patent[4] describes, in part, the problem it solves as follows:

> Prior art payment terminal devices are generally programmed in a conventional manner. That is, programming comprises a sequential set of operating instructions which are executed in sequence to carry out a remote payment transaction. This "sequential program" may be directly compiled onto the processor of the device so that the device is under direct program control or, as is more usual, an applications program in a conventional programming language may control operations through a BIOS/OS. Whatever conventional programming form is used, however, the device suffers from the problems which are discussed in the preamble of this specification. The programs are not portable between devices having different hardware or operation system architectures and it is necessary to write a program so specifically for each type of device. Further, any amendments to the operation of the device must be programmed by a programmer having knowledge of that particular device and program arrangement.

As stated above, prior to starting the Cardsoft business, Ogilvy had worked for the Australian affiliate of the Ingenico Defendants in the Texas Action. He was knowledgeable not only about the terminals produced by Ingenio but also the terminals produced by Hypercom and by the Verifone Defendants in the Texas Action. Ogilvy knew that Ingenico, Hypercom and Verifone used different hardware and proprietary software in their terminals.[5] There was no program that could run terminals manufactured by these and other manufacturers of terminals. Ogilvy decided that the terminal industry was inefficient in this regard and set out to develop a technology to eliminate that inefficiency by creating software and software development tool that would allow the various terminals to run a common program.

Ogilvy knew the terminal manufacturers would resist his approach:

---

[4] Exhibit 1 to Kantner Declaration (Hypercom Appendix, pp. 4-42).

[5] Exhibit 3 to Kantner Declaration, Ogilvy Deposition, Vol. I, at pp. 21-23 and 31-34 (Hypercom Appendix, pp. 54-56 and 62-65).

> What Cardsoft was trying to do was write programmes to run across the different terminals and, generally, speaking, the manufacturers didn't have that objective. They wanted their programmes to just run on their devices, it's not generally in their interest, and in fact, in the commercialization of the [Cardsoft] product, efforts to overcome that barrier were the biggest barrier to commercializing this [Cardsoft] product that manufactures had a vested interest to keep things custom.[6]

Nevertheless, Ogilvy set out to change the terminal manufacturers' minds.

In particular, Ogilvy and the Cardsoft salesman he hired set out to persuade Hypercom that Hypercom should adopt an "open software" approach and to license CardScript to do so. Ogilvy first began to pitch CardScript to Hypercom in 1996 or 1997. Ogilvy spoke to George Walner, the then CEO of Hypercom, and others at Hypercom, from 1996 or 1997 until his departure from Cardsoft in 2001. Ogilvy described his effort as follows:

Q. What you were trying to do in your discussions with Hypercom was to shift them from a closed approach or custom approach, to use your terminology, to a more open approach, is that fair?

A. That is correct. And it's not just Hypercom. These discussions took place with no more Hypercom than other industry players. The discussions were there with all of the industry players - with Ingenico, VeriFone, with basically every major player.

. . .

Q. You were trying to sell to Hypercom, by way of your communications with Mr. Wallner, CardSoft technology that was of the open approach; correct?

A. That is correct.

Q. And ultimately, by the time you left Cardsoft, you had been unsuccessful in selling or licensing any Cardsoft technology to Hypercom; is that correct?

A. That is my understanding. Correct, yes.[7]

By virtue of having tested CardScript on Hypercom's terminals and his discussions with Hypercom, Ogilvy learned a great deal about Hypercom's terminals. In his deposition, Ogilvy testified that he has never had any reason to believe Hypercom (or Ingenico or VeriFone) ever

[6] *Id.*, at p. 47 (Hypercom Appendix, p. 76).

[7] *Id.*, at p. 52-53 (Hypercom Appendix, pp. 81-82).

misappropriated any of his (Cardsoft's) intellectual property:

Q. Mr. Ogilvy, would you consider an application for a patent to be part of CardSoft's intellectual property?

A. Yes, I would.

Q. During the period of time you were at CardSoft, did you ever have any reason to believe that VeriFone was misappropriating any of CardSoft's intellectual property?

A. Misappropriating? No, I did not believe that.

Q. Okay. Did you have any reason to think that Hypercom was misappropriating any of CardSoft's intellectual property?

A. No, I did not have any reason to think they were misappropriating.

Q. Did you have any reason to think that Ingenico was misappropriating any intellectual property of CardSoft's?

A. No, I didn't have any reason to believe that.[8]

**B. Sweet Becomes CEO of Cardsoft**

After Ogilvy moved the Cardsoft business to the United States and incorporated Cardsoft, Cardsoft's Board of Directors fired Ogilvy and hired Donald E. Sweet as the new Chief Executive Officer of Cardsoft.

In the United States, Cardsoft helped start an industry-setting body called the Small Terminal Interoperability Platform ("STIP") Consortium. Cardsoft's purpose in establishing and largely running the STIP Consortium was to encourage terminal manufacturers to use Cardsoft's proposed open approach and to agree on a standard for implementing an open approach. The goal of the STIP Consortium was to develop a specification that would allow an application to run on different payment terminals and other devices and to operate with other applications from different vendors. In short, the goal of the STIP Consortium was an "open platform."

In 2002, Cardsoft reached out to Hypercom to determine if Hypercom would work with Cardsoft. Hypercom later informed Cardsoft that Hypercom was not interested in working with

[8] Exhibit 3 to Kantner Declaration, Ogilvy Deposition, Vol. II (pages not numbered) (Hypercom Appendix, at pp. 91-92).

Cardsoft because Cardsoft's patented software did not mesh with Hypercom's proprietary software.

By 2005, Cardsoft's business had failed. Cardsoft decided to sell its patents. In particular, Cardsoft entered into an agreement with Earl Sacerdoti, a consultant, pursuant to which Dr. Sacerdoti was to pitch Cardsoft's patents to Intellectual Ventures, an organization formed by Nathan Myhrvold, a former Chief Technology Officer of Microsoft, to acquire and license patent portfolios.[9]

Cardsoft believed its patents were worth up to $5 million. In order to justify that purchase price, Cardsoft engaged Dr. Sacerdoti to prepare pitch documents to be provided to Intellectual Ventures. One of the pitch documents was titled "Infringement Analysis of Cardsoft's Patents vis-à-vis the GlobalPlatform." (The GlobalPlatform was formed by the merger of the STIP Consortium and GlobalPlatform, Inc.) In preparing this document, Cardsoft and Sacerdoti, who was working for a commission, understood that the more companies they could argue infringed the patents the higher the price that could be obtained for the patents:

> Q. Now, would it be fair to say that you were trying to get as high a price as possible for the patent portfolio you were attempting to sell to Intellectual Ventures?
>
> A. That would be fair.
>
> Q. And would it be fair to say that the more people you could show might infringe a patent issued on the application for apparatus and method for controlling communications, the higher price might be?
>
> A. Yes.
>
> Q. The more people who might infringe, the higher the potential royalties, for example, correct?
>
> A. Correct.[10]

Notwithstanding that financial incentive, the Infringement Analysis that Dr. Sacerdoti prepared did not list Hypercom, Ingenico or VeriFone as an infringer. Indeed, Dr. Sacerdoti does not

---

[9] Exhibit 4 to Kantner Declaration, Deposition of Earl Sacerdoti, pp. 15-16 and 19-20 (Hypercom Appendix, pp. 100-103).

[10] *Id.*, at pp. 44-45 (Hypercom Appendix, pp. 107-108).

remember Cardsoft even asking him to analyze whether Hypercom, Ingenico or VeriFone terminals infringed Cardsoft's patents:

Q. Did Mr. Sweet, the CEO of CardSoft, or anyone else at CardSoft, ask you to undertake an infringement analysis with respect to any terminals manufactured by VeriFone?

A. I do not recall.

Q. Did Mr. Sweet or anyone at CardSoft ask you to undertake an infringement analysis with regard to terminals manufactured by Ingenico?

A. I do not recall.

Q. Did Mr. Sweet or anyone at CardSoft ask you to undertake an infringement analysis with regard to terminals manufactured by Hypercom Corporation?

A. I do not recall.

Q. And did you in fact ever undertake an infringement analysis with regard to any terminals manufactured by Hypercom, Ingenico or VeriFone?

. . .

Q. In other words, whether you were asked by Cardsoft or not, did you ever undertake to evaluate whether terminals manufactured by Hypercom, Ingenico, and VeriFone might infringe a patent issued on the application for the method and apparatus for controlling communications?

A. As far as I can recall, the – the only infringement, in quotes, analysis – which again, "analysis" was a lightweight thing, not – not the sort of work I would do for an expert witness engagement, was with respect to the – STIP specification and – as I – as I read this document it reminds me, and the GlobalPlatform specifications, that included or incorporated the STIP specification.[11]

In August 2005, after Cardsoft failed to sell its intellectual property to Intellectual Ventures, Cardsoft filed a continuation application. Dr. Sacerdoti explained as follows:

Q. Dr. Sacerdoti, this Exhibit 10 is an email message that you sent to Mr. Donald Sweet – Mr. Don Sweet at CardSoft on the 25th of March, 2005?

A. Yes.

[11] *Id.*, pp. 42-43 (Hypercom Appendix, pp. 105-106).

Q. You wrote, "Don, " quote, "You have asked me for my recommendations concerning the patent recently allowed by the U. S. Patent Office," closed quote."

Was that a true statement?

MR. MULDOON: Objection; foundation.

THE WITNESS: That's what the email says.

BY MR. KANTNER:

Q. So presumably you wrote what you understood to be true, that – he had asked you for a recommendation along those lines, correct?

A. That's what the email says. I don't – I don't recall that specific request. But –

Q. But that's what you wrote?

A. I – yes, that's what I wrote.

Q. And you continued, quote, "I have reviewed the specification and discussed the claims with your engineering team," closed quote, correct?

A. Correct.

Q. The specification that you're referring to is the specification for the '945 patent marked as Exhibit 3, correct?

MR. MULDOON: Objection, foundation.

THE WITNESS: That's how I would interpret this email, yes.

BY MR. KANTNER:

Q. Continuing, you wrote, quote, "Considering the claims that have been allowed, I was unable to find material in the specification that could support asserting much broader infringement against the GlobalPlatform and FINREAD standards," closed quote. Correct?

A. Correct.

Q. That's what you wrote to Mr. Sweet on March 25, 2005?

A. Yes.

Q. Continuing, quote, "I think our best bet for maximizing the future value of the patent is to file an application for a continuation, asserting additional, more specific claims that explicitly cover the STIP EFT/POS profile and the infringing option of the STIP Mobile profile," closed quote, correct?

A. Correct.[12]

[12] *Id.*, pp. 84-86 (Hypercom Appendix, pp. 109-111).

**C. Cardsoft's Patent Lawsuit Against Hypercom**

Having failed to sell its intellectual property to Intellectual Ventures, and with the '945 patent having been issued, Cardsoft set out to enforce its rights. In March 2006, Cardsoft sent letters to numerous companies stating that if this implemented the GPD/STIP Specification 2.2, this infringed Cardsoft's patents and inviting them to license Cardsoft's patents. No one took a license.

On March 14, 2007, Cardsoft entered into a General Assignment pursuant to which Cardsoft assigned all of its assets, including its patents to Cardsoft Creditors. Cardsoft Creditors, in turn, engaged Sherwood Partners to attempt to sell the patents. Sherwood Partners agreed to sell the Cardsoft assets on commission. On July 24, 2007, Sherwood Partners sent an e-mail message to hundreds of companies asking them whether they had any interest in acquiring Cardsoft's intellectual property. On August 7, 2007, Sherwood Partners sent out a second invitation. No one made an offer. Therefore, in March 2008, Cardsoft and Cardsoft Creditors filed the Texas Acton.

## III. HYPERCOM'S MEET AND CONFER EFFORTS

Clearly, Donald E. Sweet has knowledge of relevant facts. Sweet was the Chief Executive Officer of Cardsoft from at least 2001 to 2007.

Therefore, on September 17, 2010, Hypercom's trial counsel contacted Mr. Sweet and requested an opportunity to discuss the facts of the case with him.[13] Just three days later, Cardsoft/Cardsoft Creditors' trial counsel advised Hypercom's counsel that they represented Sweet.[14] Therefore, Hypercom's counsel advised Cardsoft/Cardsoft Creditors' counsel that Hypercom intended to depose Sweet and served a subpoena on Sweet for the production of documents and a deposition.[15]

In response to Hypercom's subpoena, on or about October 12, 2010, Cardsoft/Cardsoft Creditors' counsel served objections[16] stating, in relevant part, as follows:

---

[13] *See* Exhibit 5 to Kantner Declaration (Hypercom Appendix, p. 122).

[14] *See* Exhibit 6 to Kantner Declaration (Hypercom Appendix, p. 123).

[15] *See* Exhibit 7 to Kantner Declaration (Hypercom Appendix, pp. 124-127).

[16] *See* Exhibit 8 to Kantner Declaration (Hypercom Appendix, pp. 128-132).

> 1. Mr. Sweet objects to testifying at the time and place identified in the subpoena. At the present time, Mr. Sweet is on medication and is unable to testify. Mr. Sweet will testify at the offices of Duane Morris LLP, Spear Tower, One Market Place, Suite 2200, San Francisco, CA 94105 at a time mutually agreed upon by the parties in this case when his condition improves.

On November 15, 2010, Hypercom's counsel sent an e-mail message to Cardsoft/Cardsoft Creditors' counsel asking when Mr. Sweet would be able to give his deposition.[17]

On January 14, 2011 Cardsoft/Cardsoft Creditors' counsel responded:

> As we discussed, Mr. Sweet is still taking narcotic pain medication for his back problems; his prescription is for Vicodin which affects his ability to testify. Mr. Sweet is scheduled for another back surgery on February 3, 2011, which, along with the attendant pain medications, will likely provide us with a window of opportunity in mid-March to April. Please let me know if this time frame for his deposition poses any problems with you.[18]

On March 2, 2011, Hypercom's counsel asked for a date for Mr. Sweet's deposition within this "window of opportunity."[19] When Cardsoft/Cardsoft Creditors' counsel did not furnish one, Hypercom's counsel re-issued the subpoena – setting the document production for June 30, 2011 and the deposition for July 6, 2011. Sweet was served on May 22, 2011.[20] Hypercom also had someone observe Sweet's residence. On May 26, 2011, this observer saw Sweet walk from his car to the front door of his house without any difficulty and without any apparent pain.[21]

On July 1, Cardsoft/Cardsoft Creditors' counsel asserted once again that Mr. Sweet could not give a deposition on the date specified in the subpoena. This time, Cardsoft/Cardsoft Creditors' counsel provided a Declaration from Sweet himself regarding his medical condition.[22] Sweet only declared, however, that he was "presently unable to testify at the times and dates identified in the subpoena . . . due to [his] current physical condition and present medications."

---

[17] *See* Exhibit 9 to Kantner Declaration (Hypercom Appendix, p. 133).

[18] *See* Exhibit 12 to Kantner Declaration (Hypercom Appendix, p. 141).

[19] *See* Exhibit 13 to Kantner Declaration (Hypercom Appendix, p. 142).

[20] *See* Exhibit 14 of Kantner Declaration (Hypercom Appendix, pp. 143-187).

[21] *See* Exhibit 15 to Kantner Declaration (Hypercom Appendix, p. 187).

[22] *See* Exhibit 16 to Kantner Declaration (Hypercom Appendix, pp. 188-193).

Sweet did not claim that he would not be able to give a deposition at some point in the future.

Finally, Cardsoft/Cardsoft Creditors' counsel stated on July 1, 2011 that they were reviewing documents provided to them by Mr. Sweet and intended to produce documents responsive to the subpoena, but Cardsoft/Cardsoft Creditors' counsel did not provide a date and have not responded to Hypercom's counsel's request for a production date.[23]

## IV. <u>MR. SWEET SHOULD BE ORDERED TO GIVE A DEPOSITION AND TO PRODUCE DOCUMENTS</u>

Hypercom has "bent over backwards" to accommodate Mr. Sweet's medical condition for nearly a year. In addition to offering to take Mr. Sweet's deposition during one of the "windows of opportunity" that was offered, Hypercom's counsel has offered great flexibility and offered to take Sweet's deposition on short notice. Finally, Hypercom's counsel has advised Cardsoft/Cardsoft Creditors' that he can complete the deposition in about two to three hours, is willing to take breaks as needed and is even willing to take half of the deposition one day and the rest of the deposition the following day if that would help.[24] All to no avail.

Hypercom did not withdraw the subpoena it served on May 22, 2011, for the production of documents on June 30, 2011 and the deposition on July 6, 2011.[25] Mr. Sweet has disregarded the subpoena.

This Court should issue an order compelling Mr. Sweet to produce documents and to appear for his deposition on or before September 12, 2011 or show cause why he cannot do so. As the CEO of Cardsoft, Mr. Sweet has information relevant to Hypercam's claims in the underlying action, and he has not disputed this relevance nor offered any adequate excuse for his failure to appear for his subpoenaed July 6, 2011 deposition. Fed. R. Civ. P. 45(e); *see, e.g.*, *Gonzalez v. Google, Inc.*, 234 F.R.D. 674, 679 (N.D. Cal. 2006) (under Rule 45, a nonparty is subject to the same scope of discovery as a party to whom a request is addressed pursuant to Rule 34 or other discovery rules); *see also Needa Parts Manufacturing, Inc. v. Psnet, Inc.*, 2009 WL

[23] *See* Paragraphs 17-18 of Kantner Declaration (Hypercom Appendix, p. 3).

[24] *See* Paragraph 20 of Kantner Declaration (Hypercom Appendix, p. 3).

[25] *See* Paragraph 21 of Kantner Declaration (Hypercom Appendix, p. 3).

174002, at 2 (E.D. Mich. Jan. 23, 2009) (Court ordered witness to appear for deposition within thirty (30) days of date of order provided - given the witness's health impairment, at a date and place of the witnesses's choosing). If Mr. Sweet fails to comply with that order, then he may be held in contempt. Fed. R. Civ. P. 45(e); *see, e.g.*, *Cruz v. Meachum*, 159 F.R.D. 366, 368 (D. Conn. 1994).

## V. <u>CONCLUSION</u>

For the foregoing reasons, this Court should order Donald E. Sweet to comply with the subpoena and produce the requested documents and appear for his deposition within ten days of the Court's order granting Hypercom's motion to compel.

Dated: July 29, 2011

Respectfully submitted,

JONES DAY

By: ______________________
Patrick T. Michael

Counsel for Defendant
HYPERCOM CORPORATION

SFI-704313v1